Good morning, Your Honors. My name is Michael Lozo. I represent the Laborers' International Union, Local 1124, and one of the individuals, John Norton. I'm joined by my counsel for the co-plaintiffs, Mr. Larry Silver, who is representing the Desert Protective Council and several individuals. With the Court's indulgence, I'm going to do the opening argument. Mr. Silver will be handling the rebuttals. Okay. What are you going to allocate? We'll help you watch your time. I would anticipate trying to keep my piece to under 15 minutes, hopefully more, and reserving the remainder for the rebuttal. I'd like to start with our National Environmental Policy Act concerns. Initially, the first issue we'd like to talk about is the EIS's failure to explain why curtailing the turbines—and this is the wind power project, of course, in the desert—curtailing turbines, which is to temporarily stop them from spinning so that they don't kill raptors and birds. Why that would only be applied to golden eagles and not some of the other sensitive raptor species that are found in the area of the project. The EIS concludes that the project will have unavoidable impacts on numerous raptors. A particular note is the state-listed Swenson's Hawk, which is listed as endangered under state law, and there's a number of other protected hawks as well who are in the project. There was no discussion in the EIS of why curtailment would not be applied to these other sensitive species who also have laws applied to them that prohibit the take of those species, why it would make sense to curtail the turbines only for golden eagles and not for these other sensitive species. The only discussion anywhere in the EIS is found in the final EIS in the response to comments where it says the applicant has clarified that during operation and maintenance, the radar will be programmed to monitor the sky for raptor species. However, curtailment of operating wind turbines would only occur for golden eagles that are detected in or near the project site. That's the full extent of the discussion of why this obviously feasible mitigation was apparently rejected for all the other sensitive raptor species. This mitigation was first proposed early in the process in a draft of what's called the... What do I do, what do I do, Councillor, with this ABPP? The A-member Protection Plan. Right. What do I do with that? Because it seems to have mitigation measures in it that include post-construction monitoring, a review of the monitoring data by the advisory committee, even gives flexibility to require additional mitigation measures if the data reveals impacts to birds and bats that exceed the low levels anticipated in the FEIS. That's at ER 774 through 86. I read through all of that. It seems to me then the FEIS says because of the low use of the site by raptors and bats, the collision risk for most species is low, but when I go to the mitigation measures, even in the ABPP, I find all of these mitigation measures that could be used. Right. BLM does try to argue that discussion of other mitigation measures is sufficient to justify ignoring an explanation as to why BLM rejected curtailment. The most effective mitigation that they identified for golden eagles actually stopped the turbines from spinning. Well, I understand. Golden eagles would be saved at that point. I understand what, I understood, I understand they implemented an eagle plan, and then I tried to find what there is for the bats and or the raptors, and so, or the birds, other birds. And so I looked at all these particular situations, if you will, or measures in the record that would be what we needed to do, and I saw there is, there are mitigation measures. There are mitigations, but the discussion of other mitigation measures does not fill in as to why, or any reasonable explanation of why curtailment for golden eagles works for curtailment for other sensitive species like the Swenson Sox. Well, part of the explanation is that there's a statute that's particular to golden eagles. Yes, the BLM, again, they argue that the Bald and Golden Eagle Protection Act of other hawks such as the Swenson Hawk, but there is no way to distinguish the take prohibitions under California law from the take prohibition in the Golden Eagle Act. They are, in fact, the only take prohibitions for some of these species like the Swenson Sox, which is listed under the California Endangered Species Act. There's no way to claim that the Golden Eagle Act somehow is more protective or has more oomph in its take prohibition than these other very clear take prohibitions. Well, let's go on. If you're going to go with the Swenson Hawk, here's where I, here's what I saw. The FEIS says the project site does not appear to be a major migration corridor. Use of the area by the hawk is relatively low. So I said, okay, I got to look at that, and I got to find out if there's anything that would give substantial evidence to sustain that. There are migration surveys. There's a weekly point count studies that were conducted over the course of a year. There was an analysis of arid conditions and topography of the project area that made it unattractive to migrating birds. All of those would sustain what the FEIS said. Except, Your Honor, that eagle is also a low-use raptor. It's even lower use, actually, than what they saw for Swensons, and we have other concerns about whether the Swenson surveys are accurate. But again, Judge relates to eagles, and there is a statute well in place. So we don't have that statute as it relates to these other things. So what we're looking at is, does the FEIS have any substantial evidence to sustain what it did? You do have statutes, Your Honor. You have the California Endangered Species Act. Okay. You also have Fish and Game Code 3503.5, which is a flat prohibition for other raptors, even more stringent, I'd say, than the Golden Eagle Act. And again, the low use of the Golden Eagle, if that's the justification, then it would be equally justifiable for the Swenson Socks. So the absence of an explanation of why curtailment wouldn't work for the similarly low use based on their flawed surveys, we believe. The eagles were seen for 6.5 hours out of the 2,800 hours they were looking. The Swenson Sock was seen 8.5 hours. How is there a real difference there in terms of feasibility of curtailment? There should be an explanation as to why that mitigation wouldn't work. Let's suppose, instead of doing what it did, that the FEIS had not adopted these mitigation measures for any raptors, including the Golden Eagle. Tell me why that would have been arbitrary and capricious. Well, to the extent there's evidence in the record that curtailment is an effective way of preventing, hopefully, a certain number of eagles from being killed by the blades, then it would be arbitrary and capricious for them to ignore that evidence. That's the evidence they put in that, hey, it's going to work for the eagles. And the question becomes, why didn't you explain even why it won't work for other similar raptors such as the Swenson Sock and perhaps others? So we're asking that that be sent back for them to fill in that explanation. Perhaps it works for the Swensons as well. Maybe there is some reason for some of the other raptors why it's not feasible, but there's no explanation. I asked you a slightly different question. You moved in a little different direction. It was very well done, but I'd really like you to answer my question, which is, had they decided to treat Swenson's Hawk and eagles the same, which is what you're asking, but I'm asking if they had chosen a different thing, which is that they had decided not to curtail the operation of the turbines, would that have been arbitrary and capricious? Well, it's a record review case, Your Honor, so it would depend on what they had said about why it was infeasible. Well, we now have raptors in which there's a finding as to both that there's very low usage here. So would it be an arbitrary and capricious not to have stopped the turbines when the raptors came through? I believe yes, if in fact it's feasible, especially if it's not going to curtail the turbines so much that it affects the power output in any significant way, that in that case, they should shut them down for the infrequent times one of these very sensitive species, whether it's an eagle or a listed Swenson's Hawk or the other fully protected species that happen to come into the area. They should just shut them down for a few hours or even a day, and they're not going to see any impact on the power outage or anything like that. There's no information in the record that says any of this would lead to any significant effect on the energy coming out of the facility. I'd like to move on to the concerns about the Swenson's Hawk migratory studies, which are on a reference. There is no dispute that the migratory bird surveys that were done for the Swenson's Hawks both started late in the Swenson's Hawks migratory period and continued beyond when you wouldn't expect any Swenson's Hawks to be migrating through the site. Then that entire period was used to sort of do a use analysis that watered down basically the number of Swenson's Hawks that would be at the site. Are you suggesting then the district court was absolutely wrong, that it was arbitrary and capricious what they did in this particular situation with this survey? Yes, because the main reason that the government argued it was okay to just use what is in the arbitrary survey period for Swenson's Hawks was because, oh, there's all these other bird species. Well, first of all, the Swenson's Hawk is a listed species under state law, so it's a sensitive species that deserves more than that. Certainly the CEC guidelines say that you need to adjust your surveys to accommodate these kinds of sensitive species. In addition, it's not as if there's so many birds using the site, so many different species, that they can't isolate or do a broad enough survey period that would allow them to capture the entire migration period for one of the most sensitive birds flying through the site. They did observe quite a few birds, Swenson's Hawks, flying through the site, even in the flawed survey, so they're there. But it seems to me that you're really presenting to me your jury argument, and the jury didn't buy it. What I have to find is, is there any substantial evidence to sustain what was done? Not your argument to suggest, you didn't do it right, this is the way I would argue it, jury, believe me. And the government makes a different argument and says this, this, this, which I went through. And so then again, I'm saying to myself, given my standard of review, it doesn't seem to me that I can undo what happened with the FAIS. Well, I think you can say that it was arbitrary to, for surveying this particular... Arbitrary and capricious is, frankly, choose the substantial evidence to sustain what you're doing. You've got to have some evidence, and you've got to have some basis for doing what you're doing. But if you do, it's not arbitrary and capricious just because it doesn't agree with the other side. That's what the jury does. For this piece, your Honor, I do agree, you have to have substantial evidence. So, not starting a survey for the most sensitive species flying through the site until about a month after it starts its migration for three out of four seasons, and then adding on a whole month after their migration period ends, that's not evidence. There was a weekly point count study conducted over the course of a year, right? And there was an analysis of the arid conditions and topography of the project area that made it unattractive to migrating birds, right? Those are in the record, are they not? And as our brief explains, Your Honor, those are different kinds of surveys. Those don't pick up migrations. Those pick up avian point counts. So just half an hour a week at different locations, you're not going to pick up the same information. The migratory surveys are the key to the migratory birds, and the other surveys are not designed to pick those up. So that's explained in the brief. So it's still an absence of information. It's arbitrarily picking almost random migration period as applied to the Swenson's Hawk, missing a bunch of its period and attacking on arbitrarily a full month where they're not even going to be there, and then averaging out their use from that. And my standard is, as I understand it, that the FEIS need not be based on the best scientific methodology available, only needs to have a reasoned analysis of the evidence before it. Would you agree with that? I agree, though. I don't think this is a methodology argument, Your Honor. This is common sense. Okay. I mean, if you're looking for Swenson's Hawks, the most sensitive bird flying through the site, besides perhaps the eagles, and you pick a migration period that adds a whole month on, that they're not going to be there, that's arbitrary. That's not evidence. That just doesn't make any sense in terms of that particular sensitive species migration period. I'd like to touch on the third NEPA argument that we are concerned about, which is the availability of studies referenced in the final EIS. For the first time, there were 34 studies. These were underlying key analyses in the EIS, which were the points that the site was of low use for raptors as compared to other energy facilities, and as a result that the collisions would be low as well. That statement's in the EIS. It's a core component of the analysis. We didn't have the 34 studies that were the only studies relied upon by the EIS for the comparison with other facilities until we got to the final EIS, Appendix L6. We have these references to 34 studies, a graph put into the appendix, came up there. It wasn't available during the comment period. under NEPA on the FEIS. But the ABPP need not be in final form to comply with NEPA, correct? It may not have had to be in absolute final form, but to the extent they relied on these 34 studies for conclusions made in the EIS itself, which is... Well, I mean, I looked at the National Parks and Conservation Association case, and I looked at what it was trying to say there. And so, really, I'm trying to, again, make a, if you will, a deferential decision that they didn't do what they had to do. And I read in National Parks that the ABPP need not be in final form. So I'm asking you, is this just not enough? No, they had to have... I mean, there was no question, you agree, that it was all in the final, right? The studies were cited finally in the final, yes, in the final appendix. The final EIS was included as an appendix. So whether it was absolutely final prior to that, they still had to tell the public about the 34 studies that they're going to rely on to say it's a low-use site, and hence collisions are going to be low for raptors. That wasn't available during the comment period. The expert biologist commented on that when it came out in the final, saying none of this was available. We didn't have an opportunity to really dig into that evidence to see if, in fact, these are a low-use site relative to other facilities. And we do have our Federal Land Policy Management Act claims. I'm going to let those rest on the briefs for now, Your Honor, and defer to my colleague to save some time for rebuttal because I see we're at three minutes and a half left. Thank you, Mr. Lozano. Good morning, and may it please the Court. I'm Mark Haig from the Department of Justice. With me at council table is Luke Miller from the Department of the Interior. Also at council table is Sven Eriksson and Nick Yost who represent the Ocotillo Wind Facility. I'm going to be taking 15 minutes, and Mr. Eriksson will take five, and I think we're going to stick with that arrangement for all three cases. Before diving into the details of the NEPA arguments here, two points for context. The first is that the facility has been completed and it's been up and running since the end of December 2012.  It's offsetting up to 288,000 metric tons of greenhouse gases annually. The second point is, and I think Judge Smith, some of your questions pointed to this, the basic conclusion that the environmental impacts here are relatively modest is a function of the fact that this site is largely open desert valley, no riparian resources, no water, not a lot of prey, not a lot of ridgelines that are oriented in a way that would be used by raptors during their migration. And therefore it's just not that attractive, it's a relatively low use area, and that's the basis in part for the EIS's conclusions that the impacts are relatively modest. If I could response to a couple of Mr. Luzo's specific points. First, the curtailment issue. Curtailment was identified in the draft EIS and draft ABPP as one possible mitigation measure. And there were comments on that in the comment period that asked, is the intent to apply curtailment only to eagles or to all raptors? And the answer to the question was to clarify, no, that option was intended only to apply to eagles because of their special statute under the Eagle Act. Curtailment is an unusual mitigation measure. Well, it seems to me that your opposition is saying, here's a statute well in place in California about Swainston's Ox, why were they not put involved? Excuse me. Curtailment is an unusual mitigation measure because it's expensive and difficult. It was proposed here as an experimental measure because you have to have radar that identifies the birds or a biologist, so it's difficult to do. It's being applied here because of the special status of the eagles. The California Fish and Game Department, which has responsibility for enforcing the California wildlife laws, consulted on the ABPP. They are a member of the Technical Advisory Committee that addresses decisions about whether and when to apply mitigation measures. They signed off on the mitigation approach that's adopted in the ABPP. I think counsel's argument was, look, you did this for one protected bird, and it doesn't appear that even though the eagle has a special federal statute, that the eagle gets any more protection under federal law than Swainston's hawk does under California state law. So at the very least then, the department had an obligation to explain, or the bureau had an obligation to explain, why it wasn't going to do the same for the Swainston's hawk. So it's actually asking for an explanation, not necessarily for mitigation. I think part of the explanation one has to read between the lines. Which is to say an explanation wasn't forthcoming. The explanation that's in the response to comments is we never intended this provision to apply to anything other than eagles. Eagles are much rarer than the Swainston's hawks. And so the amount of curtailment that would result if you applied curtailment for hawks would be much greater. It would be much more disruptive to the operation of the project. And you'd get much less energy. So that part of it you have to read between the lines. But on an enormous project like this and a highly detailed analysis like this, it's impossible for the agency to explain every nuance of every mitigation measure. With respect to the timing of the surveys, the raptor migration surveys were designed to capture multiple species, not just the Swainston's hawks. Mr. Luzo complained about the periods when the Swainston's were not migrating being included in the averaging data and that producing a misleading result. But the EIS also provides the raw data. So it's possible to go in and look month by month, day by day when the Swainston's hawks were identified. The averaging data is there. The individual data is there. There's nothing misleading about the way the data is presented. And whichever piece of the analysis you look at, it shows the same conclusion that the presence of the hawks is relatively limited. Our brief also goes into some detail about their arguments for the timing of the surveys. The peak presence of the hawks at, I think it's on the Borrego Springs, which is the area of, I think, 40 miles northeast of the project area where the Swainston's tend to congregate, that their peak presence there coincided with the time of the migration surveys and that you could have dozens or hundreds of hawks at Anza-Borrego Springs and no or virtually no sightings of them at the project site, which suggests that however they're getting to Anza-Borrego Springs, it's not via the project site. And again, that comes back to the point that the topography of the site is not such that it is conducive to the migration because of the location of the ridge lines, the orientation of the ridge lines, and the relative lack of prey. What about the raptor studies? Yeah, what about the studies? I think the easiest way to deal with that, or one easy way to deal with that claim, is to compare the information that's in the California Energy Commission guidelines, the California guidelines on mitigating impacts to birds and bats, which is published in, I think it's 2008, and which is cited in the draft ABPP and the draft FEIS. There's a table there, which is in the supplemental excerpts of record at 325, and that cites about a dozen studies and it has a graph that shows this curve or the range of raptor use. The highest is Altamont Pass and near the bottom end is Ocotillo. If you compare that to excerpts of record 761, which is the table, that same table, that same data expanded in the ABPP. The ABPP cites more studies, some of which were not available at the time, some of which post-date the California guidelines, but the basic thrust of the data is the same. Ocotillo is way down at the low end of the curve. So there's no basis for DPC to say, well, we were surprised, we don't know what the basis was for this low use. The additional data is cumulative or supplemental to the data that was already identified in the draft. Well, it seems to me that his biggest argument is when you put out the draft, you didn't have these additional data, additional methodologies, and we didn't have a chance to comment. Well, that is their point, and my point is that much of that data that they say is new is in the California guidelines, which were cited in the draft, and that the additional... The APB, ABPP, which is the appendix, which is citing the U.S. Fish and Wildlife's 2010 interim guidelines and the California guidelines were cited in the draft. In the draft ABPP and in the draft FE, but then included in the final. There's additional data. There's additional data in the final ABPP and in the final EIS, but the additional data adds additional data points, but it doesn't change the shape of the curve, the shape of the graph.  that's been disclosed in the draft, which is that the available studies show low raptor use at this site. If there are no further questions, I will turn the podium over to co-counsel. Thank you. May it please the court, Sven Brandt Erickson, here on behalf of Ocotillo Express and Pattern Energy, and as Mr. Hague noted, with me at counsel's table is Mr. Nick Yost. I'm going to... I guess I'd start by pointing out that what really is being requested here is simply that we do a little bit more. We do a little bit more on this issue, do a little more on that issue. This project was supported by the BLM's decision, supported by an environmental impact statement that weighs in at 4,300 pages, supported by 19 technical studies, including fully developed mitigation plans for eagles and a separate mitigation plan for birds. It is a very thorough analysis. For the job given by the statute, it's a procedural statute, and the job given to the agency is to do a reasonably thorough job of evaluating, taking a hard look at the potential environmental impacts, and to focus on the first issue raised by counsel, which is the mitigation plan, the avian mitigation plan and the idea of curtailment. First of all, you know, there's a certain amount of science by lawyer going on here and this idea of how come you didn't design this system to segregate data on swains and hawks. It's a really nice idea to develop well after the fact, but in terms of the information that was available and, you know, the issues that were raised and presented in the course of the discussion of this, you know, we start with a draft avian BAT plan, avian BAT plan, the avian mitigation plan, that identifies at ER 126 a list of possible conservation measures that may be considered if the data, the post-construction data that's reviewed shows impacts are greater than expected, and a list of possible measures are going to be used, and one of them is to use curtailment to protect biological resources. So that then triggers some questions. There is, of course, the specific proposal for curtailment for eagles, and that triggered two questions, one from EPA and one from Basin and Range Watch. Is it your intent to do curtailment for raptors or just for eagles? Just ask the question. And that question was answered in the response to comments. They clarified that it was going to be applied for eagles. Now, you know, why not do more? You can always do more. You can always do more to offset impacts. At this site, based on the evaluation that was done, the conclusion was that the threat to raptors is very low. The collision risk is very low because the number of birds present is very low. And this leads to the issue about raptor studies and how that conclusion was reached. As we explained in our briefing, pages 22 to 25 of our brief, goes through a detailed evaluation of the data that was used in the environmental impact statement, which goes well beyond this raptor data on other facilities. It actually relies upon the raptor analysis reports that were prepared for this site, which also includes information on other projects. Now, as Council for the Government has pointed out, this comparison chart that's at the back of the final avian mitigation plan. Which is at? Which is at 325. I'm sorry. 325? I'm sorry. It is at ER 761. I was going to say 761. Okay. OSER 325 is where the California guidelines graph that looks basically the same. We're talking about the ABPP, the relevant data, 761? Yes. Okay. Yes. So that graphic is at 761 in the project's avian mitigation plan. It looks a lot like the graphic that is at OSER 325, which is the California Fish and Game Guidelines, which were published in 2007. So there's four or five years in between, so there's some new studies, some new information. But the basic concept that there is a continuum of raptor use at sites and, as a result, a continuum of raptor collision risk is not new. It is something that's well understood by the individuals in this field. And I would say the appellant's expert, Mr. Cashin, a comment was made here and made in the briefs that the appellants did not have an opportunity to comment on the final EIS. In fact, Mr. Cashin, under a cover letter from the LIUNA, from the laborers, submitted 50 pages of comments on the final EIS, including 35 pages of point-by-point rebuttal to the response to comments, 15 pages of additional comments. These all appear at OSER 342 to 391. He commented on the final avian plan, including its discussion of raptor fatality data at other sites at OSER 380. He did not mention, let alone question, the raptor use data on other sites. His comments, both in his comments on the draft EIS and his comments on the final EIS, refer repeatedly to the California guidelines. He clearly was aware of that document, which would be known to any expert who works in this field. It's a common document for use in this area. I'd also note that under the NEPA regulations, there is a process laid out where a final EIS has to be out public for 30 days at a minimum. Here it was almost two months. And during that window, under the regulations at 40 CFR 1503.1b, any party can provide comments on a final EIS after it's been issued, and that clearly was done here, not just by Mr. Cashin, but by a number of other parties. On the other two issues quickly, the Swainson-Hawk data, in essence, this is just how come you didn't add a couple more weeks to the surveys that were done. The purpose of the surveys is to get a representative sample of the birds that are present in the site to have a good understanding of what the potential impacts are in the environment. These studies were clearly adequate to provide a very good understanding of what kind of presence there was, and they answered the question of whether or not Swainson-Hawks that were migrating to Borrego Springs passed over this site. And that's demonstrated by comparison of the data from the two locations. It also provided information on all the other birds and raptors and other birds that were migrating through the area, as well as information on the resident species. I also would point out, there have been a few references to the state statutes, so I just want to make sure that we're clear that there are three state statutes that are referred to in this case. Section 3511 of the Fish and Game Code, that statute only applies to golden eagles, as relevant to this case, fully protected, similar in status to the Bald and Golden Eagle Protection Act under Federal Law. Section 2080 applies to the take of listed species, only relevant here to Swainson-Hawks. In the avian mitigation plan at ER 785, there's a requirement to consult with a technical advisory committee, including a state fish and game representative, should one Swainson-Hawk or other threatened or listed species be taken. Right-of-way condition 24 requires Ocotillo to obtain a take permit if the state requires one. Finally, 3503.5, which DPC argues flatly prohibits take of all raptors and owls, is applied, if you look at the California guidelines, Appendix G, which is OSER 319 to 325, California clearly anticipates and understands that raptors will be killed by wind projects, and they anticipated that and provided guidance to permitting agencies on how to evaluate it. My time is about up. Thank you, Mr. Brad Erickson. Mr. Silver? So I think in this case here, certainly the devil is in the details. And I think, and all this, of course, is in our brief and in the record, it's important to see what's really happening with regard to Swainson's hawks on this site during the course of the surveys that were done. Fifty-one Swainson's hawks were observed moving through the site in spring 2011, and I think some 36 or 38 the next year. Now these movements, as shown in the record, were within a very limited period of time, and it's clear in the record that out of 512 total minutes of Swainson's hawk observations, and that was a lot of minutes, 293 minutes were within the turbine's rotor-swept area. That is 57% of the time observed. So it's very clear from the environmental impact studies, as well as the avian and bat protection plan, that Swainson's hawks were clearly at risk. And the pattern of their movement is they're migrating up from Argentina. There are huge concentrations nearby, 35 miles away in Anza Borrego. Certainly it was no surprise that, and here these observations were made only in two years, and they found something like 75 Swainson's hawks. And also within a limited period of time, the Swainson's hawks tend to go in small groups. And so if you look at the surveys, there were just maybe five or six days, there were some Swainson's hawks each day flying together, and 57% in the rotor-swept zone. The other significant factor here is that Swainson's hawks, though there were many in Anza Borrego, the species that is protected under state law, or threatened rather under state law, are those that nest in California. And the data is clear in the record that there are fewer than 500 individuals. Their nesting habitat in central California, for a variety of reasons, basically has been severely damaged in various ways,  Now, getting back here to the technology, Council for Pattern has indicated that there's sort of scientific lawyering here. It is very clear from the record that the Merlin radar technology that was contemplated here had certainly the capability, if it could detect golden eagles, to also detect, by virtue of their shape, other raptors. So that I don't think there's any doubt that the Merlin technology, which I think the record indicates had been used somewhat in other places, had an undisputed capability for detecting these shapes. There was also a biological monitor in a tower who could observe birds, who, if he could identify golden eagles, could also identify, at least in this case, an approaching raptor, like a buteo, even though they might not be able to say whether it's a Swainson's hawk or not. But the point here is that there is, I think, a serious gap in this record. The avian and bat protection plan indicated unambiguously, I think, that an acceptable modality for curtailing raptor predation was turbine curtailment. And that it also suggested that the capability was there by virtue of Merlin radar technology and the biologist in the tower. And so the question is not answered by saying, well, it was their intent only to protect golden eagles because golden eagles had this special status under the Golden and Bald Eagle Protection Act. That's not a sufficient rationale. There is no explanation in the record, basically, especially in light of the jeopardy to the Swainson's hawks flying 50% of the time during the rotor-swept area. And it is true that most of the year they're not there. But they may well be there, and some were observed in fall migration. But the majority of these 76 over two years were during spring migration. Hardly surprising in light of the proximity of Borrego Springs, 35 miles away, where hundreds and sometimes thousands of Swainson's hawks coming up, migrating all the way from the pampas in Argentina are found. So given the capability of that system and given the special status under California law of Swainson's hawks, truly threatened, it is certainly unclear to the plaintiffs why that modality, which is recognized in the U.S. Fish and Wildlife Service guidelines, that is turbine curtailment, was not extended to the Swainson's hawk. And I think the record also reflects that there was a kind of back and forth between Pattern and the Bureau that indicated that Pattern was very wary, as it should be, of extending or even recognizing turbine curtailment. Because to the extent that turbine curtailment is recognized as really an acceptable modality in these projects, it could threaten the economic viability of the project. In this case, we think it would not because the time of curtailment would be concentrated in just a very limited period. But Pattern only really basically wanted to protect golden eagles because they did not want that extended to other species in view of the threats to the economic viability of the project. Mr. Silver, I wanted to make sure that you had your full five minutes that you had reserved, your two and a half minutes over your time, if you'd like to sum up. Well, I think, in summary, you have to look at the conclusion that this is a low-use raptor area. That's just a broad generalization. But in focusing on a particular species with special status under state law, and for that matter, for purposes of BLM, a special status species protected under the CDCA plan and other provisions, you have to look in more detail at what those surveys are showing, when the raptors are present, and to the extent that they are exposed to jeopardy by flying in the rotor swept area. So that, I think, is... I think that the raptor deserves that degree of scrutiny. Okay. Thank you. We thank Council for the argument. Desert Protective Council v. DOI is submitted.
judges: Farris, Bybee, N.R. Smith